# UNITED STATES DISTRICT COURT

for the

Southern District of California

FILED

NOV 27 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                              DEPUTY

| In the Matter of the Search of | ) | |
|---|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | |
| Information associated with cellular telephone assigned # 619-274-4537 stored at premises controlled by T-Mobile | ) ) ) ) | Case No.   1 9 M J 5 3 0 2 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1, which is incorporated by reference.

located in the _____ District of _____ New Jersey _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-1, which is incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC § 952/960/963 | Importation and conspiracy to import a controlled substance |

The application is based on these facts:
See Affidavit of Homeland Security Investigations Special Agent Jacob R. Schneeberger, which is hereby inporated by reference and made part hereof.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jacob R. Schneeberger, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11/27/19

_____
*Judge's signature*

City and state: San Diego, CA

Jill L. Burkhardt, Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
## APPLICATIONS FOR SEARCH WARRANTS

I, Jacob R. Schneeberger, being duly sworn, state as follows:

1.      This affidavit is in support of applications by the United States of America for a search warrant for **T-Mobile**, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, New Jersey 07504, and **Verizon**, a wireless telephone service provider headquartered at 180 Washington Valley Road, Bedminster, NJ 07921, to search the account associated with the following cellular telephone numbers:

     a.  Phone # 619-274-4537 (T-Mobile), as described in Attachment A-1;

     b.  Phone # 619-372-8578 (Verizon), as described in Attachment A-2; and

     c.  Phone # 619-623-4265 (Verizon), as described in Attachment A-3

(collectively the "subject accounts") for subscriber information, telephone toll data, and cell-site geolocation data for the following time periods:

- from February 15, 2019 to April 10, 2019 (**T-Mobile** Phone # 619-274-4537);
- from February 15, 2019 to April 2, 2019 (**Verizon** Phone # 619-372-8578), and
- from April 2, 2019 until April 10, 2019 (**Verizon** Phone # 619-623-4265).

There is probable cause that these records and information constitute evidence, fruits, and instrumentalities of violations of federal criminal law, namely, violations of Title 21, United States Code, Sections 952, 960, and 963, as described in Attachments B-1, B-2 and B-3. This affidavit and application are sought pursuant to Rule 41 of the Federal Rules of Criminal Procedure and 18 U.S.C. § 2703(a), which applies to providers of electronic communication services.  In this case, as will be shown below, **T-Mobile** and **Verizon** provide electronic communication services in the form of cellular and wireless telephone service for the subject accounts.

## EXPERIENCE & TRAINING

2.      I am a Special Agent (SA) with Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), and have been employed by ICE/HSI since January of 2016.  My duties include investigating the trafficking of illicit controlled

1   substances and the importation and distribution of illegal substances. I am a graduate of the
2   Criminal Investigator Training Program and the Immigration and Customs Enforcement
3   Special Agent Training program at the Federal Law Enforcement Training Center in
4   Glynco, GA.    I have received basic training in conducting narcotics smuggling
5   investigations and the enforcement of numerous Immigration and Customs laws within the
6   United States.  Prior to my employment with HSI, I was employed as a full-time, sworn
7   federal agent with the United States Border Patrol since January 2003, having graduated
8   from the USBP Basic Border Patrol Training Academy at the Federal Law Enforcement
9   Training Center in Glynco, Georgia.  The 20-week Academy curriculum covers specialized
10  training in the Immigration and Naturalization Act, criminal law, and statutory authority, as
11  well as cross-training in Title 21 United States Code. My training has also included the use
12  of cellular and digital telephone and other electronic devices used by narcotics smugglers
13  in the normal course of their illicit activities.

14      3.      In the course of my duties, I have worked as the case agent, directing specific
15  drug-related investigations. I have also worked as a surveillance agent and observed and
16  recorded movements of individuals trafficking in drugs and of those suspected of trafficking
17  in drugs. Additionally, I have participated in the execution of numerous search warrants. I
18  have initiated and executed numerous arrests for drug-related offenses, including
19  possession with the intent to distribute and the importation of controlled substances. I have
20  interviewed defendants, witnesses and informants relative to the illegal trafficking of
21  controlled substances.  Through these experiences, I have gained a working knowledge and
22  insight into the normal operational habits of narcotics smugglers, with particular emphasis
23  on those who attempt to import narcotics into the United States from Mexico at San Diego
24  international ports of entry.

25      4.      As an agent, I have participated in numerous major narcotic trafficking
26  investigations.  I have been present and participated in undercover surveillance operations,
27  the purchase of large amounts of narcotics, vehicle stops with large seizures of narcotics

28

1  recovered, and interviewed many suspects who were arrested to further enhance my training
2  and understanding of the narcotics trafficking industry.

3       5.      During the course of my duties and while assisting other law enforcement
4  personnel, I have interviewed or conversed with countless narcotic users.   From these
5  conversations and interviews, I have become familiar with the manner in which controlled
6  substances are packaged, marketed and consumed.

7       6.      Through the course of my training, investigations and conversations with
8  other law enforcement personnel, I am aware that it is a common practice for narcotics
9  smugglers to work in concert with other individuals and to do so by utilizing cellular
10 telephones to maintain communications with co-conspirators in order to further their
11 criminal activities.  Conspiracies involving narcotics smuggling generate many types of
12 evidence including, but not limited to, cellular phone-related evidence such as voicemail
13 messages referring to the arrangements of travel and payment, names and contact
14 information for co-conspirators, photographs, text messages, emails, messages from text
15 messaging cell phone applications such as WhatsApp, social networking messages, and
16 videos reflecting co-conspirators or illegal activity.

17      7.      In preparing this affidavit, I have conferred with other agents and law
18 enforcement personnel who are experienced in the area of narcotics investigations.  The
19 facts and conclusions set forth in this affidavit are based on my own personal knowledge;
20 knowledge obtained from other individuals during my participation in this investigation;
21 my review of documents and records related to this investigation; communications with
22 others who have personal knowledge of the events, details, and circumstances described
23 herein; and information gained through my training, experience, and communications
24 with colleagues.   Because this affidavit is submitted for the limited purpose of
25 establishing probable cause in support of the application for a search warrant, it does not
26 set forth each and every fact that I or others have learned during the course of this
27 investigation.  Dates, times, and amounts are approximate.

28
AFFIDAVIT IN SUPPORT OF APPLICATIONS          -3-
FOR SEARCH WARRANTS

## STATEMENT OF PROBABLE CAUSE

### A.   MADRIGAL's Arrest

8.     On April 11, 2019, at approximately 5:33 a.m., Claudia Aide MADRIGAL De La Cruz ("MADRIGAL"), a United States citizen, applied for admission into the United States through the San Ysidro Port of Entry (POE) in California. MADRIGAL was the driver, sole occupant, and registered owner of a grey 2013 Honda Civic bearing California plate 7BIC978 ("the vehicle").

9.     MADRIGAL told CBP Officer Serrano at primary inspection that she was going to work in National City, California, and that she worked every day. CBPO Serrano noticed that MADRIGAL's crossing history did not show regular daily crossings. Officer Serrano opened the trunk of the vehicle and noticed anomalies in the passenger side rear quarter panel.

10.     CBPO J. Castilla screened the vehicle with his assigned Narcotics Human Detector Dog (NHDD). The NHDD alerted to the passenger's side door seam.  Z-Portal revealed anomalies in the doors, quarter panels, and rear bumper of the vehicle.  CBPO Macisaac pried open the driver's side rear quarter panel and discovered plastic-wrapped packages with white crystal substance that tested positive for methamphetamine.

11.     CBPOs seized seventy-nine (79) packages of methamphetamine from MADRIGAL's vehicle.   CBPOs removed 5 packages from the driver's side rear quarter panel, 11 packages from the passenger's side rear quarter panel, 17 packages from the rear bumper, 14 packages from the passenger's side rear door, 13 packages from the passenger's side front door, 8 packages from the driver's side rear door, and 11 packages from the driver's side front door.  The total weight of the packages was approximately 80.86 pounds (36.68 kilograms).   A DEA laboratory report confirmed that the packages contained 35 kilograms of actual methamphetamine.  MADRIGAL was arrested for violating Title 21 United States Code, Sections 952 and 960, Unlawful Importation of a Controlled Substance.

1 A jury trial in *United States v. Madrigal*, 19CR1595-W, is currently scheduled before the
2 Honorable Thomas J. Whelan on January 7, 2020.

3      12.    Following her arrest, MADRIGAL was advised of her *Miranda* rights and
4 elected to make a statement. MADRIGAL stated she lived in an apartment on 1933 E
5 Avenue in National City, California with her mom and sister, and was employed by
6 Walmart on Highland Street in National City, California. MADRIGAL claimed that on the
7 morning of her arrest, she was coming from her brother's house in Tijuana, Mexico and
8 heading to her house in National City, California. MADRIGAL claimed that her brother,
9 Gustavo Madrigal, cannot cross the border because he was previously deported.
10 MADRIGAL stated that she has two minor children who are with her brother in Tijuana,
11 because he is watching them over their two-week spring break.

12      13.    MADRIGAL claimed that her brother borrowed the Honda the day before
13 around 4:00 P.M. to take out his girlfriend. The next time MADRIGAL saw the Honda was
14 the following morning, at 3:30 A.M., when it was parked in the street near her brother's
15 house. MADRIGAL then drove it to the San Ysidro Port of Entry. When asked whether
16 her brother put drugs in her vehicle, MADRIGAL stated, "That is what comes to mind."

17      14.    MADRIGAL claimed she didn't know how her brother would retrieve the
18 drugs from her vehicle. She confirmed that her brother is a deported alien and cannot cross
19 the border. MADRIGAL said she planned to go to her National City apartment and park
20 the Honda in a parking space in front of a multi-unit (4) single residence. She was going to
21 sleep for a few hours before going to work. She lives in the bottom unit and can see one of
22 the parking spots designated for her apartment.

23      15.    MADRIGAL stated she is a casual methamphetamine user and uses once or
24 twice a week. She claimed that the small bindle of methamphetamine found on her person
25 at the time of her arrest by one of the CBPO was given to her by her brother.

26      16.    MADRIGAL was offered to make a phone call to tell someone about her arrest
27 and make arrangements to watch her children. MADRIGAL declined to use her phone to

28

1  make a call, saying her children are with her brother. When asked for her brother's phone
2  number, she said he does not have a phone and she does not know his girlfriend's phone
3  number.

4       **B.**    **MADRIGAL's iPhone**

5       17.    At the time of her arrest, MADRIGAL was in possession of a rose gold Apple
6  iPhone 8 Plus, IMEI: 354834096919174. MADRIGAL declined to give agents the
7  passcode to her phone. On August 7, 2019, I applied for, and Magistrate Judge Mitchell D.
8  Dembin signed a search warrant (19MJ3311), authorizing the search of MADRIGAL's
9  iPhone for the time period from December 31, 2018, through April 11, 2019.

10       18.    MADRIGAL's phone was forensically downloaded on August 21, 2019.
11  Because the device was PIN locked, only a partial extraction of data was obtained. The
12  partial download did not include any information regarding incoming or outgoing calls or
13  numbers dialed. According to the report prepared by Computer Forensics Agent
14  Christopher R. Grunst, the number associated with MADRIGAL's iPhone is 619-623-4265
15  (which is the same number as MADRIGAL provided post-arrest). **Verizon** is the service
16  provider for this phone number.

17       19.    I requested and received account information from the phone provider **Verizon**
18  regarding 619-623-4265. According to **Verizon**, the subscriber name for that number is
19  Claudia Delacruz (MADRIGAL's full name is Claudia Madrigal De La Cruz), with
20  activation date of April 2, 2019, approximately nine days before MADRIGAL's arrest.

21       20.    I obtained information regarding MADRIGAL's employment with WalMart.
22  According to the witness interviews and employment records, MADRIGAL worked at the
23  WalMart store in National City, California, from July 2018 until approximately February
24  16, 2019. WalMart records indicate that MADRIGAL left her job due to moving out of the
25  area.

26       21.    According to MADRIGAL's sister, Oralia Odle, MADRIGAL was living in a
27  two-bedroom apartment in Tijuana, and not in National City, at the time of her arrest in

28

1    April 2019.  MADRIGAL's family did not know that she quit her job at WalMart, because
2    she continued to regularly drop off her minor children with family members in National
3    City, which gave the impression that MADRIGAL was working.  MADRIGAL's sister was
4    not aware of any plans MADRIGAL had to relocate or move out of the area.

5           **C.    Additional Phone Numbers**

6           22.    WalMart provided two additional phone numbers for MADRIGAL from their
7    records, 619-372-8578 and 619-274-4537.  **Verizon** is the service provider for phone
8    number 619-372-8578.  I requested and received information for 619-372-8578 from
9    **Verizon**.    The  subscriber  name  on  the  account  was  Claudia  Delacruz,  IMEI:
10   354834096919174 (the same unique number as the iPhone 8 seized from MADRIGAL at
11   the time of her arrest).  The effective service date for that number was from February 15,
12   2019 (approximately when MADRIGAL left her job at WalMart), until the disconnect date
13   of April 2, 2019.

14          23.    **T-Mobile** is the service provider for another phone number associated with
15   MADRIGAL, 619-274-4537.  I received information from **T-Mobile** relating to 619-274-
16   4537.  Records indicate that this account was active from October 12, 2018, until April 14,
17   2019.  Thus, MADRIGAL was able to use the **T-Mobile** number in February 2019.

18          24.    Based on this, it appears that in February 2019, while keeping her **T-Mobile**
19   number, MADRIGAL obtained an account with **Verizon** and a second phone number, 619-
20   372-8578.  This coincided with the time she quit her job at WalMart.  MADRIGAL used
21   619-372-8578 for a little over a month until April 2, 2019, when she switched phone
22   numbers and obtained a different phone number, 619-623-4265 (also with **Verizon**).
23   According to the provider records, MADRIGAL used the same device (iPhone 8 Plus with
24   IMEI 354834096919174) with both **Verizon** accounts.

25          **D.    Crossing History**

26          25.    Between February 15, 2019, and her arrest on April 11, 2019, MADRIGAL
27   had approximately 40 vehicle crossings from Mexico into United States.  Although she was

28

1  not crossing the border every single day, on several occasions, MADRIGAL crossed twice
2  in the same day. For example, on Tuesday, March 5, 2019, Madrigal crossed in the Honda
3  at San Ysidro at 6:51 a.m. and then again (in the Honda) at 5:19 p.m. An hour later, at 6:16
4  p.m., the Honda crossed back into Mexico. On April 8, 2019, MADRIGAL crossed in the
5  Honda at 11:45 a.m. via Otay Mesa POE, and then again at 10:46 p.m. at San Ysidro.

6        26.    On March 26, 2019, at 4:32 p.m., MADRIGAL crossed in the Honda with an
7  individual named Luis Angel Galvez Sanchez ("Galvez") at San Ysidro POE. Galvez's
8  crossing history prior to that date was as a pedestrian. One hour later, MADRIGAL and
9  Galvez crossed back into Mexico in the Honda at the Otay Mesa ("OTM") POE.

10        27.    Subsequently, Galvez crossed together with MADRIGAL in the Honda on the
11  following dates/times:

- March 27 at 12:31 p.m. (San Ysidro),
- April 2 at 10:15 p.m. (San Ysidro),
- April 6 at 1:30 p.m. (San Ysidro),
- April 7 at 11:22 p.m. (San Ysidro),
- April 8 at 11:45 a.m. (OTM), and
- April 9 at 3:42 p.m. (San Ysidro)

      28.    On March 29, 2019, MADRIGAL and Galvez both crossed at San Ysidro at
almost the same time: MADRIGAL drove the Honda at 7:24 a.m., and Galvez crossed as
a pedestrian at 7:25 a.m. They are seen crossing back into Mexico in the Honda at Otay
Mesa at 7:48 p.m. on the same day.

      29.    After her arrest, MADRIGAL was briefly detained before she posted bail.
MADRIGAL listed Galvez as a "sibling" on her jail contact list (but did not list any contact
phone number for him). An interview with her sister Oralia Odle revealed that Galvez is
not related to MADRIGAL or any of their family members. Odle stated she did not know
who Galvez is. Odle stated that MADRIGAL allowed an individual by that name to use
the 1933 E Avenue in National City as a mailing address, and that Odle remembers a young
Hispanic male coming by to pick up mail on one occasion. Odle's understanding was that

1  this individual was a friend of MADRIGAL's.  Odle stated that Galvez had never resided
2  at the 1933 E Avenue address in National City.

3      30.    Certified records from Department of State show that an individual named Luis
4  Angel Galvez Sanchez submitted a U.S. passport application on March 27, 2019, at the City
5  of Chula Vista acceptance facility.  Galvez's application listed his mailing address as 1933
6  E Avenue, National City, CA 91950 (the address where MADRIGAL claimed to live at the
7  time of her arrest).  He listed his primary phone number as 619-372-8578 (the **Verizon**
8  phone number used by MADRIGAL from February 15, 2019, until April 2, 2019).

9      31.    Based on my training and experience, and consultation with other law
10  enforcement officers experienced in narcotics trafficking investigations, I know that drug
11  traffickers may use different phones and switch phone numbers from time to time to evade
12  detection by law enforcement.  In this case, MADRIGAL used several U.S. phone numbers
13  with local area code (619) during the time period she was crossing into the United States
14  between February 15, 2019, and the day of her arrest on April 11, 2019.  The iPhone 8 Plus
15  seized at the time of her arrest was associated with 619-623-4265 and the account was
16  activated on April 2, 2019.  Based on the unique IMEI number, it also appears that
17  MADRIGAL used the same iPhone with another number (619-372-8578) between February
18  15 and April 2, 2019.

19      32.    Based upon my experience investigating narcotics traffickers and the
20  particular investigation in this case, I believe MADRIGAL, and other co-conspirators were
21  engaged in a conspiracy to smuggle narcotics into the United States from Mexico.  I also
22  believe the co-conspirators, including MADRIGAL, used cellular phones to communicate
23  and coordinate the importation of narcotics.  Because the iPhone seized from MADRIGAL
24  was PIN locked, no information regarding incoming or outgoing calls or numbers dialed is
25  available.  I believe the information regarding phone numbers MADRIGAL was in contact
26  with during the relevant period of time may reveal other accomplices and co-conspirators
27  engaged in narcotics smuggling.  Additionally, because MADRIGAL continued to maintain

28

1   the appearance of going to work after she left her job at WalMart in February 2019, I believe
2   that historical geolocation data from the phones MADRIGAL used may identify travel to
3   or locations involved in the importation of methamphetamine or other federally controlled
4   substances, such as delivery points, stash houses, or load houses.

5       33.    Based on my training and experience, and my consultation with other law
6   enforcement officers, I am aware that **T-Mobile** and **Verizon** routinely collect and store
7   data for the electronic communication accounts to which they and other providers issue
8   telephone numbers. The data includes: (i) subscribers' contact and billing information; (ii)
9   detailed information concerning subscribers' incoming and outgoing telephone calls; (iii)
10  detailed information concerning subscribers' outgoing direct calls, text message, and SMS
11  messages; and (iv) detailed information concerning cell-site geo-location data.

12      34.    In particular, I know that cell phones connect to a provider's network through
13  cell towers or cell sites. The particular tower or site may change as a phone moves from one
14  location to another. Providers automatically record and retain this connection data as part
15  of the subject account. Records and data identifying the towers or sites to which a phone
16  connected therefore tend to identify the phone's and phone user's location at particular
17  times.

18      a.    I also know that different providers use the speed with which signals
19  travel between cell phones and cell towers ("per call measurement data," or "PCMD"), as
20  well as other data, to better calculate and record the location of phones accessing their
21  networks. Different providers may use different terminology to describe PCMD. For
22  example, AT&T has referred to the resulting location information as "NELOS" data;
23  Verizon, as "Real Time Tool" or "RTT" data; Sprint, as PCMD; and T-Mobile, as "timing
24  advance" data.

25      35.    This application requests such per call measurement data (by whatever name
26  the provider uses) for the subject accounts for the following date and time ranges:

27

28

- February 15, 2019, 08:00 a.m. UTC through April 10, 2019, 10:00 p.m. UTC (**T-Mobile** Phone # 619-274-4537);
- February 15, 2019, 08:00 a.m. UTC through April 2, 2019, 00:00 a.m. UTC (**Verizon** Phone # 619-372-8578), and
- April 2, 2019 00:00 a.m. UTC until April 10, 2019, 10 p.m. UTC (**Verizon** Phone # 619-623-4265).

Location data during this time period will help establish more specifically where the defendant's U.S.-serviced phones were located during the events above.

36.     Given these facts, I seek warrants to search the subject accounts for the records and information in Attachments B-1, B-2 and B-3.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

37.     The United States is unaware at this time of other attempts by the U.S. government to obtain this data by other means.

Special Agent Jacob R. Schneeberger
HSI Special Agent

Subscribed and sworn to before me this 27th day of November, 2019.

Hon. Jill L. Burkhardt
United States Magistrate Judge

AFFIDAVIT IN SUPPORT OF APPLICATIONS
FOR SEARCH WARRANTS                                                   -11-

## ATTACHMENT A-1

**T-Mobile** hosts the electronic communication account associated with the telephone number **619-274-4537**, that is the subject of this search warrant and search warrant application (the "subject account").

T-Mobile is an electronic communication service provider whose primary computer information systems and other electronic communications and storage systems, records, and data are located at 4 Sylvan Way, Parsippany, New Jersey 07504.

## ATTACHMENT B-1

**I.**     Service of Warrant

The officer executing the warrant shall permit the Provider in Attachment A-1, as custodian of the electronic files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

**II.**    Items to be Seized

Agents shall seize the following records, data, and information covering February 15, 2019, 08:00 a.m. UTC through April 10, 2019, 10:00 p.m. UTC, and maintained by the Provider for the subject account identified in Attachment A-1:

    a.  Subscriber information, including:
        i.   Names;
        ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);
        iii. Local and long distance telephone connection records;
        iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;
        v.   Length of service (including start date) and types of service utilized;
        vi.  Telephone or instrument numbers, including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");
        vii. Other subscriber numbers or identities; and
        viii. Means and source of payment (including any credit card or bank account number) and billing records.

   b. Records and other information about past wire or electronic communications sent or received by the subject account, including:
   i. the date and time of the communication;
   ii. the method of the communication;
   iii. the source and destination of the communication, such as the source and destination telephone numbers (call detail records), email addresses, or IP addresses; and
   iv. Cell site locations and sectors for all outgoing and incoming voice, SMS, MMS, and Data communications;

which are evidence of violations of 21 U.S.C. § 952, 960 and 963 (importation and conspiracy to import controlled substances).